### UNITED STATES of America

v.

**SLADE, INC. and Water Quality Insurance Syndicate, in personam, and the TANKER BARGE S-1511, Official Number 512033, in rem.**

### No. B-76-410-CA.

United States District Court, E. D. Texas, Beaumont Division.

Feb. 17, 1978.

of $13,044.04 in Government funds expended in cleaning up an oil spill from the Sabine River on or about October 29, 1973. The Government contends that the spill emanated from a ruptured cargo tank in defendant Slade, Inc.'s ("Slade," hereinafter) tanker barge S–1511 which arrived in the Port of Orange, Texas, in tow of the M/V EDGAR BROWN III, also owned and operated by Slade, at approximately 8:00 p. m., October 28, 1973. The voyage originated in Gibson, Louisiana, where the S–1511 and its companion barge HTCO–43 loaded a cargo of crude oil a few days earlier.

Venue and jurisdiction are proper, the United States suing pursuant to 28 U.S.C. § 1345, and the Water Pollution Prevention and Control Act, 33 U.S.C. § 1251, *et seq.*, specifically, that portion of the Federal Water Pollution Control Act (FWPCA), as amended, 33 U.S.C. § 1321 (1972). The Government also sues to recover a statutory penalty of $3,500.00 assessed against Slade for its violation of the FWPCA.

Slade contends the spill cleaned up by the Government was not discharged from the S–1511; and further, that it was denied due process of law in the Coast Guard's assessment of the penalty.

Most of the essential facts were stipulated by the parties, the threshold question left for resolution by the Court being the source of the spill. This depended on the consideration of much conflicting technical evidence, which, because of the importance of the novel scientific issue involved, will be dealt with in some detail.

In short, the Court finds the spill was discharged from defendant's S–1511 entitling the Government to recover its actual cleanup costs; and further, that defendants were not deprived of due process of law in the matter of the Coast Guard's assessment of the $3,500.00 statutory penalty which the Government is also entitled to recover.

John T. Shepherd, Trial Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for United States.

George E. Duncan, Wells, Peyton, Duncan, Beard, Greenberg & Hunt, Beaumont, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### STATEMENT OF THE CASE

STEGER, District Judge.

This admiralty action was brought by the United States of America for the recovery

## I. FINDINGS OF FACT

### A. THE STIPULATED FACTS

The following facts were stipulated to, having been established by the pleadings, interrogatories and admissions of counsel:

1. This cause of action arose within the Eastern District of Texas.

2. Defendant, Slade, at all pertinent times, was, and now is, a Delaware Corporation, with principal offices and place of business located at Orange, Orange County, Texas. It is engaged in the business of waterborne transportation of petroleum and petroleum products.

3. Slade, at all pertinent times, was the owner and/or operator of the T/B S–1511 and T/B HTCO No. 43 and the M/V EDGAR BROWN III. T/B S–1511, Official Number 512033, is a non self-propelled tanker barge of 868 gross tons of single hull construction.

4. Water Quality Insurance Syndicate (WQIS), was, at all pertinent times, the insurer of Slade.

5. On or about October 27, 1973, while in the tow of M/V EDGAR BROWN III, the T/B S–1511 collided with an unidentified submerged object in the vicinity of Mile 117 of the Gulf Intracoastal Waterway, sustaining certain damage to her hull, specifically a hole in her No. 1 starboard cargo tank.

6. Sometime during the morning of October 27, 1973, the M/V EDGAR BROWN III reported to Slade that she had sustained an underwater oil leak in Barge T/B S–1511.

7. At the time of her collision with the unidentified submerged object, the T/B S–1511 and T/B HTCO No. 43 were transporting a cargo of oil, a quantity of which was then being carried in the No. 1 starboard tank of T/B S–1511.

8. At all pertinent times, Mr. Melvin Joseph Hebert was the Relief Captain of the M/V EDGAR BROWN III, and as such was an employee of Slade and then acting within the course and scope of his employment.

9. The M/V EDGAR BROWN III and her tow moored in the Port of Orange at approximately 8:00 p. m., on October 28, 1973.

10. After mooring at Orange, a quantity of oil was transferred from the Number 1 starboard tank of the T/B S–1511 to the T/B S–1512, the transfer operation being under the control of Slade employees.

11. The T/B S–1511 remained at her Orange mooring from October 28, 1973, until on or about November 10, 1973, at which time she was towed to the Crown Central Petroleum facility, near Houston, Texas.

12. On or about November 14, 1973, the T/B S–1511 was drydocked at the facilities of the Levingston Shipbuilding Company, Orange, Texas.

13. No hull repairs and/or damage inspection were effected on the T/B S–1511 during the interval from her underwater collision until after her drydocking at the Levingston facility.

14. On or about 9:25 a. m. local time, October 29, 1973, Mr. G. W. Bennett, Harbor Master, Orange, Texas, notified the U. S. Coast Guard Captain of the Port, Sabine, Texas, that an estimated five (5) barrels of crude oil had accumulated on the water at the South end of the Port of Orange, "from an unknown source."

15. Shortly thereafter, Coast Guard personnel commenced an investigation of the oil spill.

16. The Sabine River at all pertinent locations is navigable in fact by reason of its sustenance of heavy barge and other maritime traffic.

17. Coast Guard investigators obtained samples of the oil polluting the Sabine River at the following times and places:

| | Date and Time | Location |
|---|---|---|
| (a) | 10:35 a.m., October 29, 1973 | Sabine River, Port of Orange, Texas |
| (b) | 3:20 p.m., October 29, 1973 | DuPont Cut, Sabine River |
| (c) | 3:40 p.m., October 29, 1973 | Old Cow Bayou, Sabine River |
| (d) | 10:05 a.m., October 30, 1973 | 200 feet from Light No. 5, Sabine River |

18. Coast Guard investigators obtained samples of oil from the following barges at the times indicated:

| | | |
|---|---|---|
| (a) | 2:10 p.m., October 29, 1973 | No. 1 starboard tank T/B S–1511 |
| (b) | 2:15 p.m., October 29, 1973 | No. 4 port tank, T/B S–1512 |

19. On or about November 6, 1973, the aforesaid six (6) samples were mailed by the U. S. Coast Guard to, and received by, the Environmental Protection Agency (EPA), Chemical Laboratory, Houston, Texas facility, where certain chemical and physical tests were performed on them shortly thereafter.

20. On or about October 29, and 30, 1973, Slade, Inc. caused certain oil spill cleanup services to be performed on its behalf by Renner, Inc., of Port Arthur, Texas, in the vicinity of T/B S–1511's moorings in the Port of Orange, for which services it paid Renner, Inc. the sum of $231.75.

21. Slade, Inc. did not clean up, or cause to be cleaned up, the oil observed by Coast Guard investigators in the vicinity of the intersection of the Sabine River and Cow Bayou, and other parts of the Sabine River.

22. On or about October 29, 1973, pursuant to contract No. DOT–DG8–6413, Project No. 140030, the U. S. Coast Guard engaged the services of Renner, Inc., who, during the interval of October 29, 1973 to November 8, 1973, contained and cleaned up a quantity of oil from the Sabine River.

23. For its cleanup services, aforesaid, Renner, Inc. was paid the sum of $12,456.50 of Government funds by the U. S. Coast Guard.

24. In addition to the Renner payment, the U. S. Coast Guard accumulated other personnel and material costs in the amount of $587.54, thereby accumulating total cleanup costs in the amount of $13,044.04.

25. Pursuant to its Letter Serial 5890, dated February 18, 1975, the Coast Guard demanded of Slade payment in the amount of $13,044.04, but such payment was not made, and has not since been made by Slade, nor by anyone on its behalf.

26. Pursuant to its Letter Serial No. 5890, dated April 16, 1975, to Slade, the Coast Guard repeated its demand for payment, but to no avail.

27. Pursuant to its Letter Serial No. 5890, dated June 30, 1975, to Water Quality Insurance Syndicate, Inc., the Coast Guard repeated its demand for payment, originally made to Slade, but to no avail.

28. Pursuant to its Letter Serial No. 8–3907–73/p–R, dated February 1, 1974, the U. S. Coast Guard notified Slade of its intention to assess, by the authority of 33 U.S.C. § 1321(b)(6), a civil penalty of $5,000.00, for the discharge of a harmful quantity of oil into the navigable waters of the United States. This letter advised Slade, among other things, of its right to an informal hearing, at which its evidence and any other arguments would be heard prior to any formal Coast Guard decision regarding the penalty or that Slade could in lieu of a hearing, furnish the Coast Guard a statement setting forth all facts favorable to it, bearing upon the facts of the case.

29. By its letter dated February 16, 1974, Slade denied, among other things, that the alleged pollution had been caused by discharge from its Barge T/B S–1511, and responded by pointing out that samples had been taken of the oil found at the confluence of Cow Bayou and the Sabine River and that the same did not match the samples taken from Barges S–1511 and 1512.

30. By its Letter Serial No. 8–3907–73/p dated April 24, 1974, the Coast Guard formally assessed a civil penalty in the amount of $3,500.00 against Slade and advised Slade of its right to appeal the same to the Commandant, U. S. Coast Guard, Washington, D. C.

31. By its letter dated June 7, 1974, to the Commander, Eighth Coast Guard District, Slade formally appealed the civil penalty of $3,500.00.

32. By its letter Serial No. 5830/5–8, dated April 8, 1975, Slade, Inc.'s appeal was denied by the Commandant, U. S. Coast Guard, and Slade was informed that unless payment of the $3,500.00 penalty was received within thirty (30) days, the matter would be referred to the U. S. Attorney for collection.

### B. FINDINGS OF FACT BY THE COURT

The cause came on for trial without a jury on December 7, 1977, the Court making the following additional findings of fact:

33. The report referred to in stipulated fact # 6 advised Slade management that the leak in the S–1511 was not stopped by transferring cargo into the HTCO–43. The Court therefore finds that the S–1511 continued to transit the Intracoastal Waterway in a leaking condition, such condition continuing for some time after its arrival at Orange on the evening of October 28, 1973.

34. The underwater damage to the S–1511, based on an official Coast Guard inspection in drydock, consisted of a bottom rupture in the single hull of her No. 1 starboard cargo tank, approximately 25 feet long by one foot wide.

35. The oil cleaned up by Slade (stipulated fact # 20) in the vicinity of the S–1511's moorings in the Port of Orange was discharged into the Sabine River from the S–1511 and was of sufficient quantity to produce "a film or sheen upon or a discoloration of the surface" of the river.

36. Coast Guard investigators BM1 R. D. Robinson, and GM2 L. E. Shoemaker, on October 29, 1973, observed an oil pollution of the Sabine River commencing at the Port of Orange municipal docks on the north and extending approximately seven miles downriver. The pollution caused a heavy rainbow on the water, with the heaviest concentrations located in the vicinity of Cow Bayou and Dupont Cut.

37. The cleanup services for which the Coast Guard paid Renner, Inc. $12,456.50 were performed under the personal supervision of Mr. Ellis O. Simpson, who also observed the film of oil pollutant as far south as Cow Bayou and as far north as the municipal docks. The bulk of the pollutant removed by Renner came from the heavy concentrations at Cow Bayou, and also included substantial amounts upriver from Cow Bayou as far north as Dupont Cut, the latter being approximately 1¾ miles downriver from the docks.

38. No credible potential source of the discharge other than the S–1511, such as a broken pipeline or refinery discharge, was discovered.

39. The Court finds that the oil cleaned up by Renner, Inc., for the Coast Guard, commencing in the north in the vicinity of Dupont Cut, and extending downriver as far south as the intersection of Cow Bayou, was discharged into the Sabine River from defendant Slade's barge, the S–1511.

It is not necessary that the precise gallon amount of the spill be established, a sufficient amount unquestionably having been discharged to cause "a film or sheen upon or a discoloration of the surface"[1] of the river, thereby constituting a violation of 33 U.S.C. § 1321(b)(1) and (3).

The Court's assignment of responsibility to the S–1511 resulted from careful weighing of conflicting technical testimony, ultimately boiling down to a resolution of the relative credibility of the so-called "GLC" (Gas Liquid Chromatography) tests run by the Government and the contradictory "IR" (Infrared Spectroscopy) tests run by defendants' expert.

In order to better explain its determination, the Court will discuss the technical considerations leading to this finding of fact in some detail.

### 39. A. THE GOVERNMENT'S TESTS: GAS LIQUID CHROMATOGRAPHY (GLC)

The Government's evidence, for spill identification, centered on Gas Liquid Chromatography (GLC) tests run by its expert, Mr. M. E. Garza, a staff chemist of the Houston, Texas, Environmental Protection Agency (EPA) laboratory. These were con-

---

1. The so-called "sheen test", set forth at 40 C.F.R. § 110.3(b) has consistently been upheld by the courts as a measure of the statutory "harmful quantity." The same is unchallenged by defendants. See also *United States v. Boyd*, 491 F.2d 1163 (9th Cir. 1973).

ducted on the six samples obtained by Coast Guard investigators on October 29 and 30, 1973, concerning which the custody and identification stipulated in # 17 was unchallenged.[2]

Two barge samples were tested: One from the remnants in S–1511's ruptured No. 1 starboard tank, and the other from her companion, S–1512, into which some of S–1511's cargo had previously been pumped.

Four river samples were also tested, the northernmost coming from the vicinity of the municipal docks and the southernmost from the vicinity of the "# 5 light," a charted navigational aid located on the west river bank approximately six miles downriver from the docks.[3] Thus, a river span generally conforming to the areas on which pollutants were visually observed, and where Renner performed the cleanup services for the Coast Guard, was thereby validly represented by samples of the pollutant.

Mr. Garza personally conducted the GLC tests. He reported his findings in writing by letter of November 14, 1973, to the Coast Guard Investigating Officer who, in turn, furnished them to defendant Slade as an enclosure to its initial penalty advisory correspondence (stipulation # 28). Mr. Garza concluded from his tests, and reaffirmed at trial, that the samples from the S–1511 and the four river samples "were one and the same." Although not specifically stated in his letter report, he testified the samples from the S–1511 and the 1512 were not the same.

The end product of each GLC sample test was a "chromatogram," similar to an electrocardiogram, on which the results from each sample were automatically recorded by the laboratory equipment.[4] Two separate curves were shown on each chromatogram, one in the upper half and another in the lower half. The upper curve depicted the "fingerprint" of the sample with respect to its hydrocarbon content, being produced by that portion of the equipment known as a "flame ionization detector."

As Mr. Garza testified, without challenge or contradiction, the tests for hydrocarbons, because of their relatively low boiling points, were relatively susceptible to the phenomenom of "weathering," a term used to describe the chemical and physical changes taking place in the sample between the time it was discharged and when it was collected. Samples "weather" when the more volatile components escape into the atmosphere or dissolve into the water. However, the unique feature of the GLC method is the fact that the hydrocarbon test does not stand alone, but is buttressed by another contemporaneous phase of the test, less susceptible to weathering, which produces a second, and different, "fingerprint" on the bottom half of the chromatogram. The latter depicts the makeup of the sulphur compounds in the sample, and is produced by that portion of the laboratory equipment known as a "flame photometric detector."

Thus, the GLC method employed by the Government constituted not a single test, but two separate and distinct tests which complemented each other and thereby increased the overall credibility of the GLC results. Mr. Garza's undisputed testimony emphasized that the GLC tests, particularly because of the sulphur analysis which was relatively unaffected by "weathering," pro-

2. Defendants belatedly raised the issue that the Government had not provided them with a share of the six samples obtained by the Coast Guard investigators. The evidence shows that *defendants did not even request such test material* until just before the pretrial conference on August 30, 1977, almost four years after the spill. The material could not then be provided, according to Mr. Garza, because it had long been disposed of pursuant to normal EPA laboratory housekeeping procedures. The Court therefore regards this complaint of defendants to be without merit.

3. The geographical orientation of pertinent *points is depicted on National Ocean Survey* Chart No. 11343 "Sabine and Neches Rivers," (plaintiff's exhibit # 1).

4. Mr. Garza's original chromatograms were introduced into evidence as plaintiff's exhibit # 15.

duced highly reliable oil spill identification data.[5]

. The Court accepts Mr. Garza's firm assessment that the GLC method produces overall test reliability in the neighborhood of 99.7%; the chance of an erroneous identification being less than one in one hundred, a contention unchallenged by defendants,[6] and bases its ruling on such assessment.

### 39. B. THE GOVERNMENT'S INTERPRETATION OF ITS TEST RESULTS

Mr. Garza's conclusion that the S–1511 samples and the river samples "were one and the same" was based on his painstaking comparison of both the hydrocarbon and sulphur tracings from each sample; the S–1511 record, obviously the suspected source of the pollutant, being the key record for comparison purposes.

The GLC record of any particular sample is essentially a series of peaks and valleys in which many of the broader peaks and valleys of the chromatogram are composed of many families of sub-peaks and sub-valleys, each being unique, similar to human fingerprints. In Court, Mr. Garza demonstrated a typical comparison of two "chromatograms." This was a painstakingly careful consideration of each tiny peak and valley from one sample, and a comparison with the corresponding tracings from the other sample—not a gross overall comparison—but a point-by-point analysis of not only the size and shape of each peak and valley, but also its relationship in profile and groupings to adjacent peaks and valleys.

The Court finds the accuracy and scientific reliability of Mr. Garza's tests and analysis undiminished by evidence presented by Defendants.

### 39. C. CONCLUSION OF TECHNICAL FACT

Based on its consideration of all the technical evidence, the Court finds that the test methodology of the Government, in this controversy, utilizing gas liquid chromatography, is a scientifically sound and reliable procedure which produced understandable and trustworthy results in the identification of this oil spill. The Court therefore concludes, by a preponderance of all the evidence, that the oil cleaned up by the Coast Guard, extending from Dupont Cut as far south as Cow Bayou was discharged from the ruptured No. 1 starboard tank of defendant Slade, Inc.'s barge the S–1511.

### FINDINGS OF FACT REGARDING THE COAST GUARD'S ADMINISTRATION OF THE 33 U.S.C. § 1321(b)(6) PENALTY

40. The uncontested correspondence referred to in the stipulated facts Nos. 28, 29, 30, 31, and 32 constitutes the essential history of the Coast Guard's assessment of the $3,500.00 civil penalty against Slade, pursuant to 33 U.S.C. § 1321(b)(6). The Commandant's eventual denial of the appeal marked the exhaustion of Slade's administrative remedies. Slade, and its insurer, Water Quality Insurance Syndicate, refused the Government's demand for payment; the entire matter now being before this Court.

In addition to the stipulated facts, the Court finds that:

41. Having been notified of the Coast Guard's intention to assess a statutory penalty of $5,000.00, Slade was afforded an opportunity to participate in an informal hearing at which it would be entitled to present evidence and arguments which would be considered before a final penalty decision was made.

42. Slade did not request a hearing, relying instead on two letters from its attorney which, in general, denied responsibility for the spill.

43. No hearing was ever held.

---

**5.** See A. O. Bentz, *Oil Spill Identification, Analytical Chemistry*, Volume 46, Number 6, May, 1976.

**6.** The Court notes that Judge Cowan arrived at a similar conclusion of accuracy in his unreported Statement of Facts in *United States v. Atlantic Richfield Co.* (S.D.Tex. Houston, Sept. 13, 1977).

44. The Coast Guard furnished Slade all its investigation material which the Hearing Officer had considered in assessing the penalty, including Mr. Garza's laboratory report. Copies of his chromatograms were also subsequently furnished to Slade.

45. The Coast Guard Hearing Officer eventually assessed a penalty of $3,500.00 against Slade. In this, he scrupulously complied with the Commandant, U. S. Coast Guard, Instruction No. 5922.11A, dated 23 February 1973, which contained policy regarding enforcement of the FWPCA. In consonance therewith, the Hearing Officer considered not only the matters raised by Slade in its written denials, but also the specific elements of the instruction, derived from 33 U.S.C. § 1321(b)(6): (1) the size of Slade's business, (2) the effect of a penalty on Slade's ability to stay in business, and (3) the gravity of the spill.[7]

## CONCLUSIONS OF LAW

### A. GOVERNMENTAL RECOVERY OF CLEAN–UP COSTS

■ The statutory scheme for Governmental recovery of cleanup costs is set forth at 33 U.S.C. § 1321, the FWPCA Amendments of 1972. Applying its findings of fact to the statute, the Court concludes as follows:

1. By reason of its discharge of a harmful quantity of oil into the Sabine River, a navigable water of the United States, defendant barge S–1511 violated 33 U.S.C. § 1321(b)(3) which prohibits such discharges. The quantity was "harmful" within the meaning of 40 C.F.R. 110.3(b) in that it produced a film or sheen upon or a discoloration of the surface of the river, the heaviest concentrations having been observed in the vicinity of Dupont Cut and Cow Bayou. (Finding of Fact No. 35).

2. By reason of defendants' failure to remove the discharged oil from the vicinity of Dupont Cut and Cow Bayou, the Coast Guard's action in contracting for the removal of the same by Renner, Inc., for which it was paid $12,456.50, was proper, having been specifically authorized by 33 U.S.C. § 1321(c)(1).

3. By their failure to clean up, defendants Slade and the tanker barge S–1511 became and are liable to the United States, pursuant to 33 U.S.C. § 1321(f)(1), for not only the $12,456.50 paid to Renner, but also for other personnel and material costs assumed by the Coast Guard, the total liability amounting to $13,044.04.

4. Water Quality Insurance Syndicate in its capacity of Slade's insurer similarly became and is liable to the United States in the amount of $13,044.04, the said liability arising pursuant to 33 U.S.C. § 1321(p)(3).

### B. GOVERNMENTAL RECOVERY OF THE STATUTORY PENALTY

■ The statutory basis of the $3,500.00 penalty assessed against Slade is set forth at 33 U.S.C. § 1321(b)(6). Defendants' allegation that they were denied due process of law is cryptic at best, no evidence having been presented to the Court on the matter except, perhaps, for their cross examination of the Coast Guard Hearing Officer Captain (then Commander) Read. He was asked numerous questions as to whether or not he had considered many factors in assessing the penalty, all of which he answered affirmatively, and which the Court now notes are matters which defendants should have raised many years ago while the matter was still in the consideration phase. Regardless, the Court can only speculate as to the real basis of the due process complaint.

The constitutional propriety of the 33 U.S.C. § 1321(b)(6) penalty has been decisively put to rest in this Circuit by *United States v. LeBoeuf Bros. Towing Co., Inc.,* 537 F.2d 149 (5th Cir. 1976), cert. denied, 430 U.S. 987, 97 S.Ct. 1688, 52 L.Ed.2d 383 (1977), and by other cases collected in *United States v. Atlantic Richfield Co.,* supra, 429 F.Supp. at 834.

*B. Enterprises, Inc.,* 378 F.Supp. 420, 422 (S.D. N.Y.1974); *United States v. Atlantic Richfield Co.,* 429 F.Supp. 830, 839 (E.D.Pa.1977).

---

7. The propriety and legality of the policy reflected in the instruction has consistently been upheld by the courts. See: *United States v. W.*

The only remaining possible basis for the complaint would be the question of whether or not defendants were afforded proper administrative due process by the Coast Guard. In this regard, the Court found as a matter of fact that the Coast Guard's entire administration of the penalty matter was scrupulously in accordance with the law. Defendants' claim of denial of due process is therefore without merit. Brief explanatory comments are in order.

In particular, the Coast Guard complied strictly with 33 U.S.C. § 1321(b)(6) which requires that no penalty shall be assessed unless the owner is given notice and an opportunity to be heard. Mr. Hart, Slade's Vice President, admitted not only that he had been furnished with all the information the Coast Guard had on the matter, and also that having received the information, he neither requested nor attended a hearing. Thus, by its open disclosure of its information, the Coast Guard clearly has insulated itself from judicial remand such as occurred in *United States v. Independent Bulk Transport, Inc.*, 394 F.Supp. 1319 (S.D. N.Y.1975), in which the Court was dissatisfied with the Coast Guard's failure to provide defendants with all the information on which the penalty was based.

Similarly in a Florida case involving the Coast Guard's assessment of a motorboat equipment penalty, defendant sought no hearing, but attempted to argue the merits of the penalty at trial, just as defendants herein now seek to accomplish. There, Judge Young concluded he had no authority to consider the merits because defendant had failed to pursue the remedy established by law. *United States v. Carl Page Hall*, 1963 A.M.C. 725 (M.D.Fla.1962). The Court also agrees with the reasoning in *Independent Bulk Transport* and *Hall, supra*, and finds itself without authority, in a trial *de novo*, to consider the merits of defendants' contentions. *See United States v. Beatty, Incorporated*, 401 F.Supp. 1040 (W.D.Ky.1975); *also, Ward v. Coleman*, 423 F.Supp. 1352 (W.D.Okla.1976).

## CONCLUSION

In conclusion, judgment in accordance with these findings of fact and conclusions of law will be entered as follows:

1. As to the plaintiff's First Cause of Action:

In favor of plaintiff United States of America and against defendants Slade, Inc. and Water Quality Insurance Syndicate, *in personam*, and the tanker barge S–1511, *in rem*, jointly and severally, in the amount of $13,044.04, together with costs and interest at the rate of nine (9%) percent per annum running from the date of this judgment.

2. As to plaintiff's Second Cause of Action:

In favor of plaintiff United States and against defendant Slade, Inc., in the amount of $3,500.00, together with costs and interest at the rate of nine (9%) percent per annum running from the date of this judgment.

Any finding of fact heretofore made which constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law which is a finding of fact is hereby adopted as a finding of fact.