**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Donald E. DISTLER,**
**Defendant-Appellant.**

No. 79–5339.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 10, 1980.

Decided Feb. 12, 1981.

Rehearing Denied March 31, 1981.

Frank E. Haddad, Jr., Louisville, Ky., for
defendant-appellant.

John L. Smith, U. S. Atty., Michael R. Tilley, Asst. U. S. Atty., Louisville, Ky., Raymond W. Mushal, Pollution Control Section, Dept. of Justice, Washington, D. C., James R. Williams, and David Everett, U. S. Dept. of Justice, Cleveland, Ohio, for plaintiff-appellee.

Before EDWARDS, Chief Circuit Judge, and BROWN and KENNEDY, Circuit Judges.

BAILEY BROWN, Circuit Judge.

Appellant, Donald E. Distler, was convicted after a jury trial in the Western District of Kentucky of two violations of the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.). Criminal penalties are imposed by 33 U.S.C. § 1319, which provides in part:

(c)(1) Any person who willfully or negligently violates section 1311, 1312, 1316, 1317, or 1318 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator or by a State or in a permit issued under section 1344 of this title by a State, shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both. . . .

33 U.S.C. § 1319 (1977).[1] In this appeal appellant presents several issues for review including challenges to certain evidentiary rulings made at trial, a challenge to the constitutionality of Fed.R.Evid. 801(d)(1), and a contention that the evidence offered at trial was insufficient to sustain a verdict of guilt. For the reasons expressed below, we affirm appellant's conviction in all respects.

I.

The pollutants involved in this case are hexachlorocyclopentadiene (hexa), octachlorocyclopentene (octa), and hexachlorobenzene (HCB). Appellant was convicted of discharging a mixture of these pollutants, called PCL bottoms, into the Ohio River, by way of the sewers of the Louisville and Jefferson County Metropolitan Sewer District (MSD).

PCL Bottoms

Hexa, a chlorinated hydrocarbon, is an intermediary product used in the production of other chemical compounds, including pesticides and flame retardant resins. Commercial hexa is produced in batches, which have as a byproduct waste chemicals called PCL bottoms. PCL bottoms are comprised of a combination of approximately 10–15% hexa, 30% octa, 5% HCB, and a variety of miscellaneous polymers. During the time period relevant to the indictment, the Velsicol Chemical Corporation (Velsicol) plant in Memphis was the only manufacturer in the United States of hexa, and therefore the only source of PCL bottoms, the chemical wastes associated with its production.

PCL bottoms do not mix with water and are heavier than water. If they are placed in water, a very small amount rises to the surface, while the great bulk of the material remains at the bottom. The portion exposed to the air volatilizes, emitting a distinctive odor, and in some instances, a haze. If volatilized, PCL bottoms cause eye and skin disorders similar to those caused by tear gas.

Because of the propensity of PCL bottoms to solidify at normal temperatures, these waste chemicals were kept in suspension for transportation by mixing them with a Number 4 grade fuel oil. The Number 4 grade oil, not normally refined directly, was produced by mixing a metered quantity of light cycle Number 2 grade oil, similar to kerosene, with an estimated quantity of heavier Number 6 grade oil. Because no two estimates of the quantity of Number 6 grade oil needed to complete the mixture were the same, each tankerload of PCL bottoms contained a unique blend of oils.

---

1. Section 1319 is the criminal enforcement section of portions of the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.). The specific sections that appellant was convicted of violating, 33 U.S.C. §§ 1311 and 1317, provide authority for the Administrator of the Environmental Protection Agency to establish guidelines for the disposal of pollutants. Failure to follow the guidelines established pursuant to those sections results in the imposition of criminal penalties pursuant to Section 1319.

Closedown of the Morris Forman Wastewater Treatment Plant

Beginning in mid-March, 1977, employees of MSD's Morris Forman Wastewater Treatment Plant (Morris Forman Plant) began complaining of a variety of physical ailments caused by particularly noxious fumes and odors. These complaints came predominantly from employees working in the Screen and Grit Building. This building contains four rectangular tanks, known as grit chambers, which are equipped with a series of screens that strain sewage as it enters the plant.

During the week of March 21, 1977, maintenance crews complained of chemical fumes that burned their eyes, noses, throats, and skin. On March 25, a crew directed to clean grit chamber three removed the water from the chamber, and the fume problem became worse. Attached to the walls of the chamber was a very thick, viscid, brownish residue. Noxious fumes frustrated efforts to clean the chamber with water and steam.

After the plant manager was notified of the problems in the grit chamber on March 27, 1977, a sample of the residue was taken from the chamber and sent to the Environmental Protection Agency (EPA) lab in Athens, Georgia. Tests performed there revealed the presence of hexa and octa. Velsicol's Memphis plant manager came to Louisville on March 29, 1977, and confirmed that the material in the grit chamber was "hex bottom." A sample of this substance, sample # 1110 (MFP), was later introduced in appellant's trial.

Because of the toxicity of PCL bottoms, the plant was essentially abandoned in late March, and virtually all the sewage normally entering it passed untreated into the Ohio River. Between March 29, 1977 and June 8, 1977, approximately 100 million gallons of untreated sewage passed into the Ohio River daily.

The only firm receiving PCL bottoms after mid-1976 that had any direct relationship to the Louisville area was the Chem-Dyne Corporation of Hamilton, Ohio (Chem-Dyne), near Cincinnati, which was under contract to Velsicol to transport its PCL bottoms to Canada for disposal. Review of available shipment records revealed that Chem-Dyne delivered PCL bottoms to Kentucky Liquid Recycling, Inc.

Kentucky Liquid Recycling, Inc.

Kentucky Liquid Recylcing, Inc. (KLR), a liquid waste disposal company, was incorporated in Kentucky on August 17, 1976. Appellant was the sole shareholder and sole member of the board of directors. Appellant was also the registered agent for service of process, and the principal office of KLR was appellant's home.

In late August, 1976, appellant contacted the Kentucky Department of Natural Resources to determine what permits were required in order to operate a liquid waste disposal company. In Louisville, on September 16, 1976, appellant leased portions of a Rowan Street warehouse, and in early March, 1977 he leased a brickyard. During this time, appellant also began operating a former Amoco tank farm, located in nearby New Albany, Indiana. KLR generated operating funds by accepting and hauling waste materials and by the sale of some of the drums and their contents.

From December, 1976, through April, 1977, Chem-Dyne was the exclusive transporter of Velsicol PCL bottoms. In late 1976 or early 1977, Chem-Dyne personnel came to Louisville to discuss the disposal of PCL bottoms with appellant. KLR's incinerator designer was informed of various aspects of PCL bottoms incineration, and he was questioned about the ability of the proposed KLR incinerator to adequately accomplish the task. Appellant was provided with a description of the various chemicals included in the Velsicol waste product and was given material data safety sheet that described the toxic properties of those chemicals.

In February, 1977, it was agreed that KLR would store the PCL bottoms in tanks until the incinerator was operational and the required permits were obtained. If KLR did not obtain the required permits within six months, or if Chem-Dyne's customer, Velsicol, did not approve of KLR,[2]

---

2. Velsicol had no knowledge of Chem-Dyne's contract with KLR to dispose of PCL bottoms until some time after the dumping incident.

then Chem-Dyne would remove the material.

Shipment of PCL Bottoms from Velsicol to KLR

To stabilize the PCL bottoms for shipment, Chem-Dyne drivers would pick up a PCL bottoms tanker, proceed to the Delta Oil Refinery in Memphis, and take on a load of Number 4 grade oil. The full tankers would then be delivered to KLR in Louisville. At some later time, the Chem-Dyne drivers would pick up the empty tankers, either at the New Albany site, or at a Holiday Inn on Dixie Highway, near Louisville. Chem-Dyne tankers were shiny metallic or stainless steel in color or finish and were shaped either as straight tubes or with a V-shaped drop in the middle. These were easily distinguishable from appellant's tractor tanker, which consisted of a blue Autocar truck tractor and an orange-red, straight tube tanker.

Location of the Source of the Contaminant

Between approximately March 29 and April 4, 1977, officials attempted to ascertain the location at which the toxic contaminant was introduced into the MSD sewer system, utilizing a trace procedure that combined sniff searching and actual sampling. Officials collected samples from the major trunk lines feeding into the Morris Forman Plant in their attempt to identify the contaminated lines. They concluded that the principal point of introduction of the contaminant into the sewer was within two or three blocks of the 28th Street and Broadway intersection in Louisville.

Investigation of KLR

In early April, KLR was investigated in the attempt to discover how the PCL bottoms could have entered the sewer system. On April 4, 1977, personnel from the EPA and other administrative agencies visited those properties known to be owned or controlled by KLR.

Random sampling of these sites revealed some drums with significant concentration values of hexa. Investigation of appellant's Rowan Street warehouse revealed about 5,000 stacked drums, some of which bore Chem-Dyne markings. At the KLR site in New Albany, EPA personnel took samples from each of the ten tanks. Sample # 1257 (KLR 1), was taken from Tank # 6, and was later introduced in evidence at appellant's trial.

After the FBI entered the case, search warrants were obtained for all the sites inspected by the EPA as well as for the Hardin County brickyard leased by appellant and the farm site on the Dixie Highway owned by appellant's father. These warrants were executed between April 15 and 17, 1977. The searches revealed large quantities of chemicals on each site, including hexa, octa, and HCB in degrees of concentration ranging from "trace amounts" to "significant concentrations." On April 15, 1977, sample # 1785 (KLR 2) was taken from Tank # 6 at the New Albany site, and was later introduced in evidence during appellant's trial.

Lewis Avenue Investigation

On April 17, 1977, the EPA and the FBI received information that a demolition site contiguous to the intersection of 28th Street and Broadway might be the place where the toxic contaminants were dumped into the sewer. The demolition site was surrounded by fence, with access to the area available only through a gate adjacent to an oil storage tank area.

Upon arriving at the site, investigators were shown three manholes on Lewis Avenue. Samples were taken from manholes 3, 4, and 5. The samples from manhole 5 showed no trace of hexa or octa. The samples from manhole 4 showed the presence of some hexa and octa, and the samples taken from manhole 3 were "hot." One of the samples from manhole 3, sample # 1872 (Lewis), was later introduced in evidence during appellant's trial.

II.

Appellant makes two challenges to the admission of grand jury testimony at his trial. First, appellant argues that some of the grand jury testimony was not "inconsistent" with the trial testimony, and was thus erroneously submitted to the jury as substantive evidence of guilt under Fed.R. Evid. 801(d)(1)(A). Rule 801(d)(1) provides:

(d) A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving him; . . .

Second, appellant argues that allowing any grand jury testimony to be considered as substantive evidence of guilt violates his Sixth Amendment right to an "open trial" and violates his due process right not to be convicted on the basis of unreliable evidence.[3]

The eyewitnesses who testified at appellant's trial were predominantly associated with Highway Wrecking Co., which was carrying on the demolition at the site that we have referred to. This concern was operated by Frank Hornung, who happened to be a close friend of appellant. The eyewitnesses, who testified at appellant's trial in late 1978, had also testified before the grand jury in mid-1977. During the one and one-half year hiatus between the grand jury proceedings and appellant's trial many of the witnesses forgot portions of their grand jury testimony or remembered it with less certainty of detail. Accordingly, much of the grand jury testimony was introduced in evidence at appellant's trial and was considered by the jury as substantive evidence of guilt in accordance with Fed.R. Evid. 801(d)(1).

█ With regard to appellant's assertion that some of the grand jury testimony was erroneously admitted under Rule 801(d)(1)(A) because it was not inconsistent with in-court testimony, our review of the record convinces us that the trial court did not abuse its discretion when it admitted the challenged grand jury testimony. We think it clear that, for purposes of this rule, partial or vague recollection is inconsistent with total or definite recollection. Thus, when a witness remembers events incompletely, or with some equivocation at trial, it is not improper to admit a prior statement that otherwise complies with the limitations of Rule 801(d)(1), if that prior statement indicates that at an earlier time the witness remembered the events about which he testifies with more certainty or in more detail. In such a case, it may well be that some of the prior testimony corroborates the in-court testimony. The admission of this evidence, however, is not error if, as is the case here, the prior statements are predominantly inconsistent with the in-court statements, and the corroborative portions are needed to set the whole in context. Determinations such as these are properly left to the discretion of the trial court, and that discretion was not abused here.

█ In addition, we note that much of the grand jury testimony introduced at trial involved prior statements concerning identification, and was properly admissible under subsection (C) of Rule 801(d)(1), which contains no inconsistency requirement.

With regard to the consideration of appellant's constitutional challenge to the admission of grand jury testimony as substantive evidence of guilt, a review of the legislative history that preceded the adoption of Rule 801(d)(1)(A) is helpful. The Rule as originally submitted to Congress by the Supreme Court, as the House of Representatives noted in its Report, would have allowed *any* prior inconsistent statement to be considered as substantive evidence of guilt by the trier of fact, "an approach followed by a small but growing number of jurisdictions and recently held constitutional in *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)." H.R. No. 93–650, 93rd Cong., 2nd Sess., Note to Rule 801(d)(1), *reprinted in* [1974] 4 U.S. Code Cong. & Ad. News, 7051, 7086. The House amended the Rule, limiting the ad-

3. This is essentially a Confrontation Clause challenge, as appellant's main argument against the use of grand jury testimony is that it is unreliable because before the grand jury "leading questions and hearsay are permitted; confrontation is not." Appellant's Brief at 49.

missibility of prior inconsistent statements under the Rule to "those made while the declarant was subject to cross-examination at a trial or hearing or in a deposition." *Id.* at 7087.

The Senate rejected the House amendment as too restrictive, opining that since the Rule is operative only if the declarant testifies at trial, at which time he may be cross-examined, the requirement of cross-examination at the time the original statement is made is unnecessary. The Senate emphasized the benefits of the rule allowing the jury to consider testimony given "nearer in time to the events, when memory was fresher and intervening influence had not been brought into play." S.Rep.No. 93–1277, 93rd Cong., 2nd Sess., Note on Rule 801(d)(1)(A), *reprinted in* [1974] 4 U.S. Code Cong. & Ad. News 7062–63.

The version of Rule 801(d)(1)(A) that was eventually adopted resulted from the efforts of a joint House and Senate committee. In its report, the joint committee stated that "[t]he rule as adopted covers statements before a grand jury." Conference Report No. 93–1597, 93rd Cong., 2nd Sess., Note on Rule 801(d)(1)(A), *reprinted in* [1974] 4 U.S. Code Cong. & Ad. News 7104.

The opinion referred to in the House Report, *California v. Green*, 399 U.S. 140, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), is also instructive at this point. In *Green*, the Supreme Court held that the admission, as substantive evidence of guilt, of prior inconsistent statements is not violative of the Confrontation Clause as long as the declarant testifies, and is subject to cross-examination, at trial. The Court identified three protections furthered by the confrontation requirement: to insure that the witness testifies under oath; to allow cross-examination of the witness; and, to provide the jury with the opportunity to observe the demeanor of the witness as he testifies. *Id.* at 158, 90 S.Ct. at 1934. Although it noted that these protections may be absent with regard to an out-of-court statement, the Court stated that "if the declarant testifies at trial, the out-of-court statement for all practical purposes regains most of the lost protections." *Id.* Because of this, the Court noted that there is "little reason to

distinguish among prior inconsistent statements on the basis of the circumstances under which the prior statements were given." *Id.* at 168, 90 S.Ct. at 1940.

■ We think it clear that the admission, as substantive evidence, of grand jury testimony that meets the requirements of Rule 801(d)(1)(A) does not run afoul of the Constitution. The Rule was expressly formulated to allow admission of grand jury testimony, and this court and others have held that grand jury testimony admitted under the Rule may properly be considered as substantive evidence of guilt. *See e.g., United States v. Woods*, 613 F.2d 629, 637 (6th Cir.), *cert. denied*, 449 U.S. 877, 101 S.Ct. 222, 66 L.Ed.2d 99 (1980); *United States v. Mosley*, 555 F.2d 191, 193 (8th Cir. 1977), *cert. denied*, 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1978); *United States v. Castro-Ayon*, 537 F.2d 1055, 1057 (9th Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976).

The Court in *Green, supra*, indicated that, as long as the declarant testifies at trial, the circumstances surrounding the rendering of the initial statement are of little import. Indeed, the Rule as submitted by the Court contained no restrictions on the character of prior inconsistent statements that would have been admissible. The Rule in its present form contains more protections than the version submitted by the Court, and contains more restrictions than the language of *Green, supra*, would seem to indicate is necessary.

■ In any event, the protections furthered by the confrontation requirement, as enunciated by the Court in *Green, supra*, are adequately served by Rule 801(d)(1)(A). The declarant must testify at trial; he must be subject to cross-examination concerning the statement; and, the statement must have been given under oath. Thus, we find no merit to appellant's constitutional challenge to the validity of Rule 801(d)(1)(A).

### III.

Appellant also contends on this appeal that expert testimony indicating that samples taken from the KLR site, the Lewis Avenue manhole, and the MFP grit cham-

ber came from the same source was improperly admitted. In support of this contention, appellant argues that this expert testimony fails to satisfy the standard adopted by this court in *United States v. Brown*, 557 F.2d 541 (6th Cir. 1977). In *Brown*, this court stated:

> Four factors must appear in the record to uphold the admission of expert testimony: 1. qualified expert; 2. proper subject; 3. conformity to a generally accepted explanatory theory; and 4. probative value compared to prejudicial effect.

*Id.* at 556. Specifically, appellant argues that the expert testimony introduced with regard to oil matching has not gained general acceptance in its scientific field.

Oil spill identification, or oil matching, may be accomplished utilizing various test procedures, some of which are discussed below. Experts in oil matching refer to a four-category system when they express their results: match; possible match; indeterminate; and, non-match. It is important to note at this juncture that the expert testimony in this case regarding comparisons of various samples refers to the matching of the oil that was mixed with the PCL bottoms for transportation and not to a matching *per se* of the PCL bottoms themselves.

The matching of oil samples is made possible because of the unique characteristics of crude oil. Oil is formed when biological matter is trapped underground and is subjected to heat and pressure for a period of time. In each underground pocket, different ratios of plant and animal matter are present, and the oil eventually produced from this combination is unique. This uniqueness enables experts to distinguish oil samples, even as between two samples taken from adjacent pockets within the same geological formation. The refined oil retains its unique character.

The methodology of oil matching involves the isolation of the molecular compounds associated with oil, particularly hydrocarbons and sulphur compounds. Instrumental in this process is the gas chromatograph, which is essentially an extremely sensitive filtering machine. The particular sample to be tested is mixed with a liquid solvent. The mixture is heated until it forms a gas. The gas is then forced through a column, which is a glass tube filled with special filtration material. Each molecular compound will elute through a given column and temperature at the same rate. At the outgoing end of the column a detector is attached, which records the quantity and concentration of each particular molecular compound contained in the sample. The data thus accumulated are converted into electrical impulses, which are recorded in graph fashion, called chromatograms. Comparison of the graphs reveals whether the tested samples match.

EPA chemist Frank Allen tested the two KLR samples, the Lewis sample, and the MFP sample using the gas chromatograph in conjunction with two different types of detectors, one specific for hydrocarbons (FID) and one specific for sulphur compounds (FPD).[4] Allen concluded on the basis of independent analyses of FID data and FPD data that the four samples came from the same source.

Dr. Alan Bentz, a research chemist with extensive expertise in the area of oil matching, found, on the basis of FID data, that the four samples came from the same source. At trial he interpreted the FPD chromatograms of the MFP samples and the KLR 1 sample, concluding that this data indicated that the two samples matched. In Dr. Bentz' opinion, the oil samples matched, and the presence of hexa and octa in the samples removed virtually all doubt concerning the common origin of the samples.

An expert in the area of mass spectroscopic analysis, a process that analyzes ions formed by bombarding the molecules that elute from the gas chromatograph, also testified that the KLR 1 and MFP samples

---

4. FID is the abbreviation for flame ionization detector and FPD for flame photometric detector. The FPD is 100 times as sensitive as the FID. Although these two detectors reveal results that are independently reliable, they may be attached to the column to simultaneously record data as the molecules elute from the column.

matched. In addition, experts in the field of organic analysis, which uses the gas chromatograph and various detectors to identify specific compounds, testified that all four samples matched.

In support of his challenge to the introduction in evidence of this expert testimony, appellant relies on this court's reasoning in *Brown, supra.* At issue in *Brown* was whether the process of ion microprobic analysis was generally accepted in its field as a viable method for comparing human hair samples. The court held that although ion microprobic analysis had obtained a sufficient degree of acceptance in the field of mass spectrometry, the use of this technique in analyzing hair samples was still in the experimental stage.

In its discussion of the basis for the expert testimony introduced in *Brown,* the court noted that no reported cases were found in which testimony based upon microprobic analysis of hair had been admitted, and that the parties had cited no case of any kind in which evidence based upon microprobic analysis had been admitted. The court also noted that the experts who testified in *Brown* admitted that their test results had not been duplicated elsewhere and that they were unable to point to any authority in their field to support their position. Nor was there any published authority to support these experts' opinions concerning the reliability of the tests they performed. The court further noted that in addition to the absence of specific indicia of reliability, there were no absolute standards by which the accuracy of their measurements could be gauged. 557 F.2d at 557–58. Thus, the court concluded:

> While it is a truism that every useful new development must have its first day in court, expert testimony on a critical fact relating to guilt or innocence is not admissible unless the principle upon which it is based has attained general acceptance in the scientific community and is not mere speculation or conjecture. We are not convinced, on the present state of the record, that ion microprobic analysis of human hair has yet reached the level of general acceptance in its field, or that the experiments conducted in this case

have been shown to be sufficiently reliable and accurate, to provide an acceptable basis for expert identification in a criminal trial.

*Id.* at 558–59.

Reasoning from *Brown,* appellant contends that although the oil matching techniques testified about at trial are not new, the use of these techniques to analyze sewer samples has not reached the level of general acceptance that establishes an acceptable basis for the introduction of expert testimony in a criminal trial.

In *United States v. Stifel,* 433 F.2d 431 (6th Cir. 1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971), this court utilized the oft-quoted standard of general acceptance enunciated in *Frye v. United States,* 293 F. 1013 (D.C.App.1923). Quoting from *Frye* at 1014, this court stated:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to determine. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

433 F.2d at 438. In *United States v. Franks,* 511 F.2d 25 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975), this court added that "we deem general acceptance as being nearly synonomous with reliability. If a scientific process is reliable, or sufficiently accurate, courts may also deem it 'generally accepted.'" *Id.* at 33, n. 12.

We feel it best to discuss the question of whether the oil matching procedures involved in this case are generally accepted in their scientific field in terms of two separate inquiries. First, are the methods utilized in the instant case generally accepted as reliable in the oil matching field in general? Second, if the first question is answered affirmatively, are these methods

properly transferable to an analysis of the sewer samples tested in the instant case?

■ With regard to the first inquiry mentioned above, the court concludes from the record that the methods employed by the experts who testified in the instant case, namely gas chromatograph analysis performed in conjunction with the various detectors, is a generally accepted method of matching oil samples. These methods were shown to be highly reliable, and they have received a significant degree of national and international recognition.

Dr. Bentz testified that tests performed on the FID found it to be reliable in excess of 90%. Similar tests performed on the FPD found it also to be reliable in excess of 90%. Because the results obtained from each detector are independently reliable, when the results of both detectors agree, they are reliable in excess of 99%. Dr. Bentz testified that this high degree of reliability is enhanced when samples containing oil from the same source also contain the same non-petroleum components.

At least two other courts have found that gas chromatograph/FID/FPD analysis is a highly reliable method of oil fingerprinting. In *United States v. Slade*, 447 F.Supp. 638 (E.D.Tex.1978), the court found that results of oil matching tests conducted with the gas chromatograph and FID and FPD detectors yield oil spill identification results that are reliable "in the neighborhood of 99.7%." *Id.* at 644. The Southern District of Texas reached a similar conclusion in an unreported case. *See id.*, n.6. *See also* discussion in *Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, 456 F.Supp. 1327, 1342–43 (D.P. R.1978), *aff'd*, 602 F.2d 12 (1st Cir. 1979).

Further, a standard method of gas chromatograph/FID/FPD analysis has been promulgated by the American Society for Testing and Materials (ASTM).[5] Dr. Bentz testified that the procedures utilized by the experts who testified at appellant's trial did not deviate significantly from the ASTM standard procedure. In addition, domestic and foreign oil concerns have shown confidence in this oil identification procedure.

■ Having determined that gas chromatograph/FID/FPD analysis is generally accepted in the field of oil matching or oil fingerprinting, we now turn to a consideration of whether this mode of scientific analysis is properly transferable to the samples taken in the instant case. We hold that it is.

Appellant argues that gas chromatograph/FID/FPD analysis is not a generally accepted method of analyzing sewer samples. This argument is wide of the mark, however, because, as the experts in this case testified, the oil with which the PCL bottoms was mixed is the substance that was analyzed. We see no significant difference, and appellant has presented none, between analyzing oil samples taken from the sewer and analyzing oil samples taken from some other source. Non-petroleum elements, whether they be in the sewer or elsewhere in the environment, are irrelevant to the comparison of oil samples. In some cases, the non-petroleum elements in the samples enhance the reliability of the conclusion that two samples match, but nothing in the record indicates that the non-petroleum elements detract in any way from the reliability of the analysis of the oil samples. Thus, we hold that the expert testimony introduced in this case satisfies the four-part *Brown* test for admissibility.

**5.** In *Application of American Society for Testing Materials*, 231 F.Supp. 686 (E.D.Pa.1964), ASTM was described by the court as follows:

ASTM is a non-profit, charitable organization. It writes standards by which building materials and similar matters may be judged. These standards are adopted and relied upon, often without any independent investigation, by those who want to buy materials suited to their purposes. Among those who so rely are municipalities, state governments, and departments of the Federal Government. ASTM has about 12,000 members. Its membership is composed of three categories: producers, consumers, and general interest (academic, etc.). Its specifications are written by technically qualified committees composed of members from the three categories.

*Id.* at 688.

### IV.

Having determined that the trial court did not err when it admitted expert and grand jury testimony, we now turn to a consideration of appellant's contention that the evidence introduced at trial was insufficient to support a verdict of guilt. When considering a challenge to the sufficiency of the evidence, we must view the totality of the evidence, along with all favorable inferences drawn therefrom, in the light most favorable to the government. *United States v. Green*, 548 F.2d 1261, 1266 (6th Cir. 1977). When considered thusly, it is clear that sufficient evidence was presented to the jury to support its verdict of guilt in the instant case.

■ Evidence introduced at trial placed appellant, as the alter ego of KLR, in the exclusive chain of possession of PCL bottoms. Eyewitnesses saw him at the dump site on numerous occasions with silver or chrome colored tankers. The inference is clear that these were Chem-Dyne tankers. He was seen washing these tankers out, and on some occasions a hose was seen extending from the tankers into the sewer. This evidence alone would seem to adequately support a verdict of guilt. In addition, however, a substantial amount of convincing expert testimony was introduced. Thus, there was abundant evidence presented to the jury that supports its verdict.

The court has carefully considered the other issues presented on this appeal and finds them without merit. Accordingly, the judgment of conviction of appellant for violations of the Federal Water Pollution and Control Act is AFFIRMED.