**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0299n.06
Filed: April 26, 2007

**No. 06-5746**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BILLY THOMAS PHILLIPS, | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| Appellant. | ) | |

Before: SUHRHEINRICH, CLAY and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Billy Phillips challenges the district court's conclusion that he voluntarily gave an inculpatory statement to the FBI. We affirm.

I.

In November 2003, Billy Phillips violently assaulted his live-in girlfriend, Jamie Forrester, who was treated at the local hospital for "excessive bruising" over much of her body. JA 142. According to Phillips, Forrester sparked the attack by suggesting that he have sex with her 11-year-old daughter. Seeking leniency from the Weakley County (Tennessee) police and apparently trying to bolster his account of the incident, Phillips' attorney told the authorities that Phillips had given him a videotape depicting Forrester sexually abusing a twelve-year-old, disabled girl.

Weakley County police notified the FBI Crimes Against Children Task Force about the tape, and the FBI began investigating Forrester and Phillips. On January 6, 2004, in connection with that investigation, FBI Agent Steven Lies, Shelby County (Tennessee) Police Officer Dallas Dallosta and Weakley County Police Officer Brett Davis went to Phillips' home. Phillips invited the officers in and agreed to talk about the tape. During the hour-long conversation, Phillips signed a form permitting the FBI to search computers and other digital media that Weakley County officers took from his house. The interview ended when Phillips' children returned home, but he "wanted to continue to cooperate" and "said that any time [the officers] needed him to make a statement that he would be willing" to do so. JA 88.

Investigators searched Phillips' computers and digital storage devices during the next month. They discovered 48 images depicting Forrester's abuse of the disabled girl; hundreds of pictures depicting "minors engaged in sexually explicit behavior," JA 138; and thousands of digital movies "depicting teens and adults engaged in sexually explicit conduct [including] bestiality and sado-masochism," *id*.

On February 5, Agent Lies telephoned Phillips to let him know that he could retrieve his computers and to ask him to come to the Memphis FBI office to answer additional questions. Later that day, Phillips went to the office, where Agent Lies, fellow FBI Agent Joseph Rinehart and Officer Dallosta interviewed him. They began the session by advising Phillips of his *Miranda* rights and explaining that he was not under arrest, that his cooperation was voluntary and that he was free to leave at any time. The agents then presented Phillips with an "Advice of Rights" form, which

listed his *Miranda* rights. Phillips initialed each one and signed the form, consenting to be interviewed without a lawyer.

Over the next hour and forty-five minutes, the agents asked Phillips questions and prepared a statement for him to sign based on his responses. Phillips signed the statement, acknowledging that he did so "freely and voluntarily without threat of reprisal or reward." JA 95. He admitted to "receiv[ing] child pornography via E-mail through going to various [websites] and putting [himself] on mailing lists," *id.*, but claimed that he likely obtained any pictures found on his computer at a time when he "did not know what child pornography was" and that he "stumbled" upon the pictures by signing up for mailing lists, JA 96. Shortly after signing the statement, Phillips left the FBI office.

On February 17, a federal grand jury returned a seven-count indictment charging Phillips and Forrester with several child pornography offenses. Forrester pleaded guilty, while Phillips moved to suppress the February 5 statement from being used against him at trial. The district court denied Phillips' motion, reasoning that Phillips gave the statement voluntarily.

On February 22, 2005, about a year after being indicted and on the second day of his trial, Phillips pleaded guilty to conspiracy to possess child pornography, *see* 18 U.S.C. § 2252(b), aiding and abetting the sexual exploitation of a minor, *see* 18 U.S.C. §§ 2251(a), 2, and possession of child pornography, *see* 18 U.S.C. § 2252(a)(4)(B). The government agreed to drop the remaining charges against him, and Phillips reserved the right to appeal his unsuccessful suppression motion. Consistent with the plea agreement, the district court sentenced him to a 120-month prison term.

II.

"[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Courts thus prohibit the government from introducing at trial involuntary statements given in response to "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). In considering whether a police interrogation has crossed this line, we look at "the totality of the circumstances" to determine whether "a defendant's will was overborne in a particular case," *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)—circumstances that include the defendant's age, his level of education and intelligence, whether he was advised of his rights, whether he suffered physical punishment and the length of the questioning he endured, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). A finding of coercion must be supported by evidence that the police engaged in objectively coercive activity, that the coercive activity was sufficiently severe to overcome the defendant's will and that the defendant's decision to speak stemmed from these coercive activities. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

The circumstances of this interrogation support the district court's conclusion that Phillips made the February 5 statement voluntarily. Phillips agreed to the meeting, and the agents never placed him under arrest that day. Before asking any questions, the agents advised Phillips of his *Miranda* rights, memorialized his understanding of those rights by having him initial each one on the Advice of Rights form and asked him to sign the form to acknowledge his waiver of those rights.

- 4 -

Other contextual factors confirm that this was not the "rare" case in which the defendant "can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). Phillips signed the statement about one hour and fifteen minutes after waiving his rights, and he makes no allegations that the agents deprived him of any creature comforts or that they threatened him with physical harm during the interview.

Nor does Phillips' background or his physical or mental state at the time of the interview indicate that he had any reason to do anything other than advance his own interests—including speaking the truth—during his meeting with the agents. At the time of the interview, Phillips was 37 years old and he came to the interview sober and "coherent." JA 124. Although he dropped out of high school during his junior year, his presentence report indicates that his IQ tests averaged about 107 and that he could maintain a job. Suggesting that Phillips retained his wits about him throughout the interview, Phillips added a hand-written caveat to the typed statement, noting that he "never told [Forrester] about seeing any child porn." JA 96.

Phillips also was not a beginner in dealing with the legal system. Before being indicted on federal child pornography charges and before the February 5 interview with the FBI agents, Phillips faced an assault charge in state court for beating Forrester. The federal investigation started when he gave officers the videotape depicting Forrester abusing a disabled girl—apparently in an effort to obtain lenient treatment from the state for attacking his girlfriend. In 2002, moreover, Phillips was convicted for failing to pay child support. His criminal history report also shows two arrests that did

not lead to convictions—one for being a fugitive from justice, another for assaulting Forrester's ex-husband.

Phillips' contrary arguments are not convincing. *First*, he claims that he was confused about the purpose of the interview. Because the agents said that they were investigating Forrester when they first spoke to him at his house, Phillips claims that he did not realize that the second interview concerned *his* involvement in child pornography. In making this argument, however, Phillips does not contend that the agents misrepresented their aim in speaking with him, and of course the agents' decision to warn him of *his Miranda* rights hardly suggested that Forrester was the only subject of the investigation. At any rate, "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 577 (1987).

*Second*, Phillips claims that the agents, after being "very nice and polite" at the outset of the meeting, changed their "tone" after he agreed to waive his rights. JA 119–20. The key change in tone, however, appeared to stem from the agents' insistence that Phillips give "specific" rather than general answers to their questions. JA 120. Having just been informed that he remained free to stop the questioning at any time, Phillips cannot claim that the agents forced him to make an involuntary statement merely because they began asking specific, as opposed to open-ended, questions.

*Third*, Phillips complains about two of Agent Rinehart's statements during the interview. Apparently unsatisfied by Phillips' responses, Agent Rinehart told Phillips that the agents "were trying to decide how much of a monster [Phillips] was, whether or not [he] should spend 18 months in jail or whether [he] should spend the rest of [his] life in jail." JA 122. He also expressed frustration with Phillips' answers, suggesting that Phillips "should leave the country and go to Bolivia." *Id*. Both of Agent Rinehart's statements were unnecessary and inappropriate. But that does not mean that they transformed the interview into a coercive environment. Not only had Phillips just been told that he could cut off the interview at any point, but "[m]ere emotionalism" does not transform a voluntary interaction into a coercive one. *McCall v. Dutton*, 863 F.2d 454, 460 (6th Cir. 1988) (holding that statements were voluntary although made while in handcuffs and surrounded by yelling police officers who had their weapons drawn) (internal quotation marks omitted); *see also United States v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002) (holding that "alleged threats to investigate [defendant's] daughter were not of such a gravity that an ordinary person . . . would have lost the will to resist"); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 806, 810 (9th Cir. 2003) (holding that confession was not coerced when, during eight-hour interrogation, officer "raised his voice" at times and "called Cunningham a liar and said he knew that Cunningham committed the offense").

Phillips also fails to explain how the comments made his statement involuntary. He claims that they caused him to feel threatened because he felt that "anything could happen at that point." JA 120. But nothing about what Agent Rinehart said carried any implication that Phillips was

physically at risk. Nor did the questioning imply that, if Phillips would confess, the agents would think him less of a monster, would be lenient in their investigation of him or would no longer think he should leave the country. *See Mahan*, 190 F.3d at 423 (holding that agent statement that "lying could get [defendant] in serious trouble" was not coercive; the agent "made no promises to induce [defendant's] cooperation, nor did he make any threats of physical violence").

What Agent Rinehart not so subtly implied is that the agents' questions concerned a serious criminal matter, one that could lead to considerable jail time. But that only brought home the seriousness of the situation—and indeed that is how Phillips took it. He began to think he might be arrested, *see* JA 121 (explaining that after Agent Rinehart's comment he "wasn't sure . . . [he] was going to leave"), and he became worried about the prospect of spending time in jail, *see* JA 122 (potential jail time "sounded very threatening to me"). Focusing a suspect's attention on the potential legal consequences of his actions is not self-evidently coercive; indeed, it is more likely to focus the mind on the importance of answering questions accurately, voluntarily or not at all. *See McCalvin v. Yukins*, 444 F.3d 713, 721 (6th Cir. 2006) ("We are not prepared to forbid police from conveying to suspects the seriousness of the crime for which they are being investigated."); *Ledbetter*, 35 F.3d at 1070 (6th Cir. 1994) (explaining that "an innocent defendant . . . would have little incentive to render a false confession" when "the only adverse consequences being presented to [him] were the results of ultimately being convicted of the crime"); *see also United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (holding confession was not coerced when investigator told defendant his "children would be driving by the time he was released from prison"

because statement was an "accurate representation of [defendant's] predicament") (internal quotation marks and brackets omitted); *United States v. Nash*, 910 F.2d 749, 752–53 (11th Cir. 1990) ("[T]elling the defendant in a noncoercive manner of the realistically expected penalties and encouraging him to tell the truth is no more than affording him the chance to make an informed decision with respect to his cooperation with the government.") (internal quotation marks and brackets omitted). Phillips, at any rate, offers no explanation how this line of questioning coerced him (1) into saying something he did not voluntarily want to say or (2) into confessing to a crime that he did not commit.

Phillips' interrogation offers a poor analogy to *United States v. Brown*, 557 F.2d 541, 546 (6th Cir. 1977), the primary case upon which he relies. There, the court held that, despite *Miranda* warnings, Brown's confession "was not the product of a free and rational choice," but was caused by Brown's "overwhelming fear that he would be beaten" due to the "manifest hostility" police exhibited towards him. *Id*. at 548. Brown, as it turned out, had ample reason for these fears. The police suspected Brown of killing a fellow officer; the confession came on the heels of an arrest during which police "flung [him] to the sidewalk where he landed on his face," "struck [him] with a closed fist once and 'nudged' [him] on the back of the head or neck with the butt of a shotgun," *id*. at 549; supervising officers were forced to take "extraordinary measures" to protect Brown from fellow officers following his arrest, *id*. at 550; Brown confessed "while placed between two officers in the back seat of the patrol car transporting him to police headquarters" following his arrest, *id*.; Brown was "emotionally distraught" while in the patrol car, *id*. at 551; and one of the officers struck

him during the trip, *id*. at 552.  The circumstances that created a coercive environment in *Brown*

have little in common with Agent Rinehart's two intemperate remarks.

III.

For these reasons, we affirm.